portfolio of appeals, we have one case to be submitted today on moral argument, Albert Sidney Johnston Chapter v. City of San Antonio. Mr. Crane. Good morning, Your Honors. I'm Tom Crane. I represent the Albert Sidney Johnston Chapter No. 2060, this appeal. Before I start, I want to point out an error in plaintiff's brief. On page 45, we point to a page number from the electronic record. We gave the wrong number. We put ROA.2345. That should be ROA.3345, and that's referring to the lower court's decision. So I want to talk to . . . I also noticed that in your table of contents and in your brief, your page numbers are a little bit off in citing the Zachary case. You don't need to send us a correction on that, but . . . I mean, I've made the correction, but there's something to watch out for. Thank you, Judge. I apologize for the error. So we're here about an ordinance. An ordinance that was passed in 1899. The ordinance . . . the only record we have of the request is that ordinance itself, and the ordinance says, Request of the Daughters of the Confederacy. Permission is granted to the Daughters of the Confederacy, but we know from unrebutted testimony that the entity making that request was the Barnard B Chapter of an organization that was known at the time as the United Daughters of the Confederacy. The lower court seemed focused on the grant of permission was given to the United Daughters of the Confederacy, but it wasn't actually. It was given to the Daughters of the Confederacy, which suggests a more generic term. In the base of the memorial is carved, or the words, United Daughters of the Confederacy dash . . . I'm sorry, Barnard B Chapter dash United Daughters of the Confederacy. So it's . . . you know, there is a factual issue regarding, first of all, who made the request and who was the request granted to, but certainly the ordinance itself says it was granted to the Daughters of the Confederacy. As Your Honor probably knows, there's a length to the sequence of events where the Barnard B Chapter closed in the 1970s, and they had a meeting with the Albert Sidney Johnston Chapter where they basically handed over the right and interest to the memorial. The outgoing president of the B Chapter gave a copy of the ordinance to the ASJ Chapter. And what is your view on what, if anything, was conveyed? Or given or granted, in your view, by the Senate? We say it was the interest of the B Chapter, and that was ownership of the memorial itself, the contents of the memorial, because there's a time capsule, and the legal right to an easement or irrevocable license. It was conveyed to the ASJ Chapter. They considered it to be theirs, and as Your Honor has probably seen, there's newspaper accounts from the 20s, the 30s, and even into the 40s. People not necessarily connected to the Daughters believed that the Daughters had some ownership right to that memorial. But it was not a conveyance of any kind of interest in real property, is that right? There is no written conveyance, Judge. Now, they did make a written conveyance of property on the east side of San Antonio to a Confederate cemetery. It's just a quick claim deed, just down and dirty from the B Chapter to the ASJ Chapter. But regarding the memorial itself, there is no written conveyance. Because under Texas law, that's not allowed, right? If it's a public park, the park can't give away the property? No, Judge. You can't convey property, but if you convey an easement, you're still bound by—it's a government entity. If you convey an easement, you're still bound by the Texas Common Law, which makes that a binding easement. This doesn't happen often, and I only found two cases on the topic, but it has happened. You can use the property, you just can't own it, right? That's what we believe, Judge. The ASJ Chapter claims to have an interest in that memorial and the land beneath the memorial. Their higher entity, their higher headquarters, is the Texas Division of the United Daughters of the Confederacy. It's not—their higher headquarters is not the ASJ Chapter. And the Texas Division provided a statement saying they believe, or they agree, that the ASJ Chapter has whatever interest in that memorial that the Texas Division would have. In their minds, it belongs to the—or did belong to the B Chapter and then came into the possession or the interest of the ASJ Chapter. It's a private organization. It's entitled to perform its rules as it sees fit, as long as it doesn't conflict with any statute or constitutional provision, and that doesn't. It's—it is what it is. It's the organization they have chosen to use. They power down, so to speak. There is no evidence suggesting that the Texas Division is not happy with that or that the national headquarters doesn't agree with that. The only evidence on record is that the ASJ Chapter has whatever interest in that memorial that the B Chapter had at one time. There was a complete lack of due process in this matter. Robin Trazes, the president of the ASJ Chapter, tried to communicate with the city. She thought she was communicating with the city. There were two divisions of the city that apparently were working unknown to each other. There was the Municipal Archives, which was Jackie Salvador and her boss, Rudy Agus. They were working separately from the higher department heads and the city council. Jackie Salvador told Robin Trazes, we want to make the right decision. Tell us what you know about that memorial. They wanted—she specifically asked about the UDC or the ASJ Chapter having an ownership interest. No one else inquired. No one else asked. Trazes assumed that this information was for the purposes of deciding what to do. Jackie is a wonderful person, but she used that phrase, we want to make the right decision. Trazes took her at her word. Trazes tried to communicate more specifically with the city, meaning talking to the mayor or talking at those sit-ins to be heard sessions, but it's only two minutes. It's just one-way dialogue. No one asks you questions. All you do is present information, and Ms. Trazes was concerned about talking about the time capsule. This is still early in the process. No one knew what the state of the time capsule was or would be. She was concerned that if they take down or remove or do something to the statue, that the little items in the time capsule may walk away and disappear. She didn't feel like she could talk about that at a public meeting because she didn't want to necessarily notify people that that was there. Where is it now? It's in a secure place, Judge. At some point, the judge appointed a special master. Both sides agreed, and we have recovered the time capsule. As it turns out, there's not much that's recoverable. Even the coins have quite a bit of corrosion, so there's a little chance that things would walk away. They're not in very good shape, but at the time, no one knew that, and Ms. Trazes was very concerned. We filed a couple motions just to recover the time capsule early in the process. At the department level, or the city council level, no one had any awareness that the UDC or the ASJ chapter were claiming ownership, so they made no provision for it. They just kind of rolled along, assuming it belonged to them. That helps explain why there was so little communication and really no attempt at communication. The penalties defendants will talk about the ordinance. The ordinance is providing money for the removal and storage of the memorial, but the ordinance nowhere says the city claims ownership. We think we own it, or we're going to own it. There's nothing in there about ownership. There's nothing in there about the time capsule. Just a side note, this has come up more than once. Thomas Crane, that's myself. I did speak at the August 30 Citizens to be Heard meeting. I did speak. I didn't represent anyone. I didn't know anybody in the ASJ chapter and the UDC. There was no attorney-client agreement of any kind. I spoke just as an average person. The lower court said there was adequate communication, but of course the case law said it was meaningful. I don't think the judge addressed whether it was meaningful or not, but in support of his assertion, he pointed simply to the list of people who spoke, and he's just Rita Shemp, she's also a member of the ASJ chapter. They both are listed, but nothing in that list indicates whether the communication was meaningful or whether there was anything more than please don't tear down the monument. And it really was only two, three minutes at the most, two minutes on some occasions. The judge also never addressed Rule 803-20, the provision of the evidentiary rule that allows courts to use historical records. Plaintiffs pointed to four or five historical news articles to talk about the perception of the community about who owned the memorial. Without going into detail, the court said that's hearsay. It's classic hearsay. He pointed to three cases. Those three cases don't concern historical records. They concern newspaper articles that are, I think one case that wasn't dated, the other case they were three or four years old, but generally they talk about law enforcement, newspaper articles, so they're all pretty contemporary. They're not 50, 60, 70 years old. Let me ask you, how do your client's claims differ from the plaintiff's claims in the McMahon case? The McMahon case did not claim ownership, Judge, so their theory of recovery wasn't due process. It was simply, they were very little case law on this, but we are asserting that there is a First Amendment right for people in privately owned property, and this wasn't privately owned. Even in our view of the evidence, it's an easement or, another name escapes me, but anyway, it's not ownership of the property itself, but I think those cases still apply because the principle is if it's property that you control, you have a different type of First Amendment freedom. We, I mean, plaintiffs agree completely that you can't, as an average citizen, you don't have the right to decide what goes in a public park. I think that's been decided for a decade now. So is it your, if you were ultimately and completely successful here, what would happen? Would it mean that you would have control over the physical property, or would it mean that you would have the right to have the monument replaced into the park? We, Judge, the ordinance says what it says. It says as long as the B chapter, and now the S.J. chapter, uses that center of the park for purposes of the memorial, then they have the right to use it. Do I think in reality that we'll be able to put it back? I'm doubtful, but I think we'll have to come to an arrangement with the city because to give up an easement in a downtown, prime downtown area, that has some value. And, of course, the daughter's most concerned about the memorial and where it goes. And, of course, what's left in the time capsule still has some value even in a corroded state. I want to point out, too, that the lower court just frankly weighed evidence. It said the ordinance is not an ordinance, apparently accepting that there were three city employees who testified. One did say flatly that if the ordinance is in the minute book but not in the ordinance book, then it's not an ordinance. But her employee, Salvador, said, well, but if it's an approved ordinance, then it's an ordinance. And then, of course, the city secretary, who's the boss over the two other ladies, said generally it was the ordinances that involved spending money that made their way into the ordinance book. But even so, the ordinance books aren't organized. There's an affidavit from Rita Shemp where she and the Marks pointed 1899 meeting. You can see where the city approved 10 ordinances. Only six of them made their way into the ordinance book. There's nothing in those books, in the minutes ordinance book, that says if you're not in the ordinance book, you're not in the ordinance. The judge, I'm not sure what the judge didn't really explain where he came, where he had arrived at the conclusion that it's a minute book and therefore it can't be an ordinance. I think that's the beginning of the discussion, not the end. That makes this not an appropriate case for summary judgment. Are minutes signed by the mayor? Wasn't this document signed by the mayor? I don't recall now if in the original minute book is that signed by the mayor. Certainly, the copy that the daughters had was signed by the mayor. My recollection is the 1875, Texas 1875 statute does require that the mayor approve once the board votes for an ordinance. If it's an ordinance. Yes, ma'am. I believe that's one of the requirements. In any event, this ordinance met all those requirements. What type of, suppose you write it's an ordinance and suppose you write it's an easement, what kind of easement do you think it is? Irrevocable. It's as long as you use it in accordance with the grant of permission. So my understanding of Texas law is you basically have two different kinds of easements. You've got easements in gross and easements appurtenant. I suppose you have to say it's an easement appurtenant, right? Because it needs to run with the land somehow. I would guess so. I don't claim to have authority on the difference between easements and gross. Well, I'm curious. I suppose you think it doesn't actually matter what kind of easement it is? I think it probably doesn't because it's in writing. We have a writing. Well, the writing says that the permission goes to the Daughters of the Confederacy to put up the monument. It doesn't specifically talk about easements. So that's kind of why I'm confused. Suppose you write basically all the way up to that point. I'm not sure where the court would go to define the property right past that point. I don't have an answer for you, Judge. All right. Your time has expired. You've saved time for a vote, Mr. Craig. Thank you. Mr. Fitzpatrick. May it please the Court. So I think that this appeal, or this case, begins and ends with what that minute entry means. And it is a minute entry. If you look at the record where the minute entry is laid out in its full context, at page 1647, you'll see that that minute entry was one of the matters taken up by City Council on that day under the category of memorials and petitions. It was not offset with a header that indicated that it was an ordinance. It was not recorded as an ordinance. And the summary judgment evidence was clear and uncontested that what you have there, there were three different versions of this. There's the actual copy of the minute book. And then there was a typewritten excerpt from the minute book. And then there was another, it looked like a handwritten excerpt as well. But they were all excerpts from the minutes. If you're right about that, then you would be telling us that nothing was conveyed or granted or given. Is that right? Yes, that's right. But I think I'm telling you that, no, I am telling you that even if it had been an ordinance, nothing was conveyed or given. And the reason why is because, and this is going back to when Texas transitioned from civil law to common law, it's been the law in Texas that all transfers of property from the government, from the public, to a private person must be construed strictly against the grantee. So it has to be, Judge Ezra had no discretion whatsoever other than to construe the terms of that minute entry or ordinance as Mr. Crane refers to it, as not transferring property if it can possibly be construed that way. Now I think the plain language of the minute entry is clear in that respect. It doesn't give anything, I think Judge Oldham pointed that out, other than permission. You have permission to build a monument on the city's property. The daughters of the Confederacy would not have come to the city and asked for permission to put this thing on the city's property if it wasn't the city's property. Again, the law, as Judge Clement pointed out, was clear also pre-Civil War era that public property held by the state of Texas or on behalf of the   So, foR our purposes, it can't be divested, I mean it can be, but under very strict circumstances that aren't present in this case. So, if I put on my hat as a former, a long, long time ago, city attorney of the city of Houston, I was always told during the four years that I was there that we could never convey any interest in a park, just forget about it, that that ratchet's only one way. You can increase a parkland or dedicate parkland, but you can't do anything to diminish the city's interest. Now, whether that applied only to fee simple transfers or whether it applied to a lesser property interest such as an ordinance, I'm not sure, but that was always my understanding, but confirm whether you think that's so or not. Yeah, I'm going to confirm that. In fact, the two ways that cities can divest their park properties is one, by an election of the citizens, and to bring in an equal amount of park property or equal value of park property. I'm not certain on whether it's an amount or a value, but you can trade off properties, but the election is the key point. So, the last point that you made, Judge Smith, is that you seem to make a distinction between an easement and a fee transfer, and I would agree with you that there is a distinction between an easement and a fee transfer, but there's no distinction between an easement and a fee transfer when the easement that is being petitioned for, as in this case, or being argued for in this case, gives the easement holder the right to control that park property, and especially the expression on that park property. That's more than just the right to walk across the property. That's more than just the right to, I don't know, have a lease space to sell trinkets or something like that. Here we are talking about a person who claims to have exclusive interest to control the expression that's permitted on that property, and again, that would be an easement that confers rights that are inconsistent with the public's right in that park. What is it that the city plans to do about the physical property? I'm not talking about returning it to the park, but I'm just talking about who has control over it, use of it, access to it, any kind of restoration activities, whatever. Is the city just going to keep it locked up somewhere, or what's going to happen if you should prevail here on this appeal? So the city council directed the city manager to, and I assume you're talking about the statue, the plinth. And the time capsule, and whatever else is there. All of that has been directed by the city council for donation to a non-profit that is dedicated to education or history. That's the language of the ordinance directing the removal, and that's the only thing that can happen with it. And what's the source of law that lets the city do that? I'm sorry? What's the source of law that lets the city do that, to sort of take ownership of it and then direct its disposition? Okay, so I don't think that there's any argument that the monument became a piece of the realty which it was affixed. The chapter has admitted that and argued that in its briefing. I believe they say that whoever owns the ground owns the statue. And also, when that piece of granite was affixed to the property, it was known at the time that that was the city's property. You wouldn't ask permission to use someone else's property unless you knew that it was their property. Your friend on the other side points out that the same organization in the late 19th century and early 20th century gave gifts like a fountain to the city of San Antonio, and there was a process for doing that. There were documents used to do that. And so if the purpose of erecting 42 tons of granite in the middle of Trappist Park was to give a gift to the city of San Antonio, they argue there was a different way to do that than just to build it the way it did. Is the position of the city that this was a gift, effectively, and that the day it was installed it became the property of the city of San Antonio? Well, I don't think that there's any evidence in the record for specific donated intent back in 1899. But I think that the law is clear that what they actually did, with full knowledge of who owns the property, was create a fixture there that became part of the realty. And that's the city's basis for asserting ownership over the monument. So you asked, Judge Oldham, you asked about the different types of easements, and there's an express type of an easement, a written easement, obviously, whereby the property is described that it's essentially an enforceable contract. But we don't have that here. We don't have anything that could possibly satisfy the statute of frauds with respect to the writing. I mean, even if there was, it would be an easement in gross, meaning that they don't own a fee interest in any property to which the easement attaches. And that type of an easement is more like a license, and it's not transferable. And they are claiming in this case that this easement was transferred to them. Well, it couldn't be if it was that kind of an easement. And they have argued also that it's an easement of pertinent, as you mentioned, or by implication. And that fails as well. It's in my briefing. I'm not going to split at a time when there was already a use, an easement use in place historically over time. And that hasn't happened here. There's no contention that there was ever a domestic or a split of fee interest. And certainly, there was... You're going to address the standing argument? Absolutely, Your Honor. I thought that was one of the stronger points that you had, which is that the B chapter was only a chapter of the larger entity to which any conveyance, if there was a conveyance, was made such that the subordinate organization could not have standing to sue. Right. So in this case, the chapter seems to be arguing it both ways. And I'm confused whenever I read their briefing, because at times it appears that they're saying that they're separate. And at other times, they are arguing that they are actually all one entity. And I'm familiar with that concept in the religious context, but not in the organizational context. So essentially, what the argument that we have boils down to is that the chapter was either... It was either the UDC, okay? It is the UDC, which means that it doesn't have prudential standing to sue on behalf of the UDC. It would be like the San Antonio Police Department or the Houston Police Department coming in and suing. It's not a juror entity. On the other hand, if ASJ is distinct from the UDC, then there's an Article III issue. Heads, they lose. Tails, they lose. Either way that they want it, there's no standing for them to pursue the claim. And just as an aside, and I don't think that Mr. Crane is even arguing this, but taking the easy points, neither of the two individuals has standing to make any of the claims. And I don't think that they didn't argue that they were in the brief, and they're not contending so here. But it's clear to me that they are, in fact, separate entities. The chapter brought this suit as a juror entity. I mean, it would have to believe that it has a separate existence if it was going to bring suit in its own name. And in fact, in the chapter's deposition, the chapter admitted that the UDC is not a party. He said that it's just the chapter in this record at 1365. I mean, the deposition of the chapter was really clear. They identified themselves as a 501c3 organization. They indicated that each chapter has its own charter, that each charter has its own members, and that the chapters have individual property rights to own, to hold, and to disperse their property. And indeed, you know, the chapter said clearly that it could dispose of its property without regard to any UDC rule. So it's, I believe, proven in the record that it's a separate entity. And also, I mean, if it was the same— Why can't the UDC transfer whatever right of use it has to the right to use it? To use it for the purpose of constructing a monument, a use that was completed in 1900. I don't think that they could transfer something, permission for something that had already been accomplished. But it's not there anymore. Pardon me? It's not there anymore, you said. The monument. Right, the monument's not there. Why'd they take it down? Well, the city found that it no longer wanted to present that type of expression in its park. I mean, it was city speech, and the city no longer wanted to make the speech, so city council resolved to take it down. But I think that your question, Judge Clement, brings up a strong point as to the separateness of these two entities, or three entities. And that's that, if they were all one, why would you need to transfer anything? And yet, all of the allegations, all of their argument is that they transferred in whatever interest that they believed that they had. So, returning to the jurisdiction issue, the jurisdiction issue is still deeply entangled with what the supposed property right was. And if the permission was granted to the UDC, which it was, not to the UDC, the permission was granted to the Daughters of the Confederacy. And the chapter testified that that was a grant to the UDC. Whatever was granted to the UDC, according to the chapter, there's no evidence in the record that the UDC transferred anything, or that there were rights that continued to exist that could be transferred. The chapter also admitted that nothing was transferred. And there's no evidence that it'd be, if it was the one that received the permission to construct the monument, transferred it to the UDC, or that the UDC transferred that permission to be. The key point, though, is that the language of that minute entry has to be taken. The transfer from the government to a private person, that's what we're dealing with here. If it was a transfer, that document, whether it's a property transfer, whether it's a franchise, whether it's a license, must be taken most strongly against the grantee. And if it's ambiguous, and I don't think that the chapter has ever argued that the language was ambiguous. They were just arguing that it said something that it didn't say. But if it was ambiguous, then Judge Ezra would have had to construe it against the chapter. And that's been Texas law since before the Civil War and has been reiterated by the Texas Supreme Court most recently in Bush versus Lone Oak Club at 601 Southwest 3rd, 639, just last year. And that concept is enshrined in the city charter. And it's also the foundation for the ruling against the franchisee in the case that the chapter cited called City of Lorenzo's Past versus Minter. Now, the chapter cited the it was basically a motion to dismiss for failure to say to claim whatever they called that back in the 20s. But the appeal of that order is what the chapter cited in the briefing. But the case came back on the merits. And the case was quite similar to this one. And the court determined that the private person was claiming that it owned didn't exist because there was no writing in the terms of the transfer or the grant had to be construed strictly in favor of the public. Again, I think that the jurisdictional issues are dispositive of the case. And it doesn't matter whether the chapter is part of the UDC or the chapter is not part of the UDC. Either way, the chapter doesn't have standing. And with respect to the due process, the same is true. There is no property interest. And there's no due process claim without the property interest. And again, the chapter complained here about the process that they were afforded. But that's the process that was also afforded in Schaeffer and in Shreveport and in Fox. And it passed in all of those cases. And ownership claims were made in at least two of those cases. All right. Thank you, Mr. Fitzpatrick. Mr. Crane, you've saved time for a vote. Just one point, Your Honors. Looking at the ordinance of March 27, 1899, it grants permission to the Daughters of the Confederacy, as I mentioned, not the United Daughters of the Confederacy, to be an engineer, ordered to survey and define said plant of land at once. Obviously, it appears to me the city intended there to be some interest going to the Daughters. Otherwise, what would be the point of ordering an engineer to do this or not to do this? Now, there's no record that that plot was ever done, but that would be a fact issue. That's not good for some of the judgments. But certainly, it appears the city had the intent of giving the Daughters, some Daughters, some interest in that property. But that was all I have. All right. Thank you, Mr. Crane. Your case is under submission. We appreciate counsel making the long trip here to help us resolve this case after many delays. And the Court is in recess under the usual order.